**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | No.    **25-CR-130 (TNM)** |
| | ) | |
| **ROBERT GEIGER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**<u>MEMORANDUM IN AID OF SENTENCING</u>**

### I.      Introduction

Robert Geiger, now almost 48 years old, comes before this Court having demonstrated by his actions over the past two years that he is committed to a law-abiding path moving forward. He has been compliant with his conditions of pre-trial release and has continued to be gainfully employed. Mr. Geiger's criminal history is dated, with his most recent conviction being from 2016. That year was a pivotal year for Mr. Geiger. After reentering the community in 2016, Mr. Geiger completely turned his life around, focusing his time and effort on his employment, his children, and his health. In the eight years, Mr. Geiger has re-invented himself, desisted from crime, was consistently employed, and was a productive member of society. The instant offense—for which Mr. Geiger was arrested two years ago—is an aberration when considered against this history.

Mr. Geiger is therefore not the type of the defendant that this Court might consider a "gunslinger" unable to desist from crime, or unwilling to pursue a life committed to productivity and family. Mr. Geiger has shown over the last eight

1

years, including his two years of compliance on supervision and his early acceptance of responsibility, that he is committed to a prosocial lifestyle. Given these mitigating factors, Mr. Geiger, through counsel, respectfully suggests that a sentence of time-served would be sufficient but not more than necessary in light of the statutory sentencing factors.

## II.   Procedural History

Mr. Geiger was arrested on March 11, 2024, and was initially charged in Superior Court in Case No. 2024-CF2-002426. A few days later, on March 15, 2024, he was released on personal recognizance and was supervised by the Superior Court Pretrial Agency for over a year until this same matter was transferred to federal court on June 2, 2025. On that day, undersigned counsel was appointed to represent Mr. Geiger, and he was released on the same conditions. ECF No. 7.

Mr. Geiger entered a guilty plea to one count of Unlawful Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) on October 30, 2025. Sentencing is currently scheduled for October 27, 2025.

According to pre-trial services, Mr. Geiger has only been required to check in with probation via telephone once a week. To date, in the past year, he has only missed 7 out of 40 total telephone check-ins. Mr. Geiger's phone has been in service off and on, which is why he was not able to telephonically report on certain dates. He also tested negative for illicit substances on January 23, 2026.

Mr. Geiger has reviewed the final pre-sentence report (PSR) and agrees with the calculated guidelines of 33-41 months.

### III.   Application of the Sentencing Factors

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Overall, considering *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the Court must consider the Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id.* § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions.  *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, ***recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.***

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not*

*greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court must not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further should not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351. The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Consistent with this principle, it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a), a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Ultimately, the central mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2).

### A.    History and Characteristics

Mr. Geiger has resided in the DMV area all of his life. He grew up on Galveston Street in Southeast Washington, D.C. where he was raised by both of his parents along with his older sister. His parents worked hard for a living and instilled those same work ethic values in Mr. Geiger. Mr. Geiger's parents were not well off and struggled to make ends meet but they always ensured that him and his sister had what they needed. They are now retired and are residents of Maryland. Mr. Geiger maintains a good relationship with both of them.

Mr. Geiger went to both Maryland and D.C. public schools growing up and never had any disciplinary issues. In fact, he excelled in graphic arts and knew from

a young age that he would pursue a career in carpentry and interior design and improvement.

While in high school, Mr. Geiger began using alcohol and marijuana on a regular basis. Nonetheless, he graduated and received his diploma in 1996. Notably, because of the example that his parents set, Mr. Geiger began working when he was only 15 years old. Unfortunately, simultaneously, Mr. Geiger began abusing drugs and alcohol with friends. This grew into an addiction that plagued him for years to come. Mr. Geiger acknowledges that his substance abuse addiction in his early years contributed to his criminal behavior which he feels led him to making some very bad decisions.

Despite Mr. Geiger's reliance on addictive substances, his desire to be gainfully employed led him to working as a United Parcel Handler after high school, which he did for two years. However, his growing addiction led him to have poor judgment and he unfortunately entered the criminal justice system when he was only 18 years old. Looking at his early offenses from 1997 to 2002, it is evident that his addiction was all-consuming as he was convicted of possession of marijuana and driving while impaired during this time period. When he was only 25 years old, he pled guilty in two separate cases that both resulted in a 5-year prison sentence.

Shortly before Mr. Geiger was sentenced to 5 years' incarceration, he became a father and missed the first several years of his son's life. His oldest son is now 23 years old. Mr. Geiger has always had an excellent relationship with his eldest son.

When Mr. Geiger was released in 2008, at age 30, he continued to struggle with alcoholism and was arrested for another DWI offense. He completed treatment however and successfully completed his probation in 2011. At age 31, Mr. Geiger had his second son, who is now 17 years old. Mr. Geiger was in a serious relationship with his son's mother, Ms. Johnson, residing together for 13 years until his continued struggle with addiction led to their separation. Mr. Geiger was devastated by this separation and felt as though he had lost his family. But this period of time marked a turning point in Mr. Geiger's life. He wanted to reconnect with his family, but he knew that in order to do that, he needed to be sober, he needed to be healthy, and he needed to be stable. As a result, ever since reentering the community in 2016 after his last conviction, Mr. Geiger was intent to break free from his past criminal behavior and to build a family, a career —a *life*.[1] From that point on, he has been consistently employed. When the relationship with Ms. Johnson ended in 2021, Mr. Geiger did not let his devastation take him to a point of no return. He voluntarily enrolled in grief counseling and tackled his addiction. He finally broke free from his long-standing substance abuse addiction—an addiction that had plagued him for nearly 20 years. Mr. Geiger also continued to be employed, working as a roofer, as a driver, and as a janitor, and then ultimately became self-employed.

---

[1] Studies have shown that job stability and marital attachment are significantly correlated with criminal desistance. John H. Laub, Robert J. Sampson (2001), Understanding Desistance from Crime, Crime and Justice, 28 Crime & Just. 1 at *20. Westlaw.

Mr. Geiger's criminal history can be represented graphically as follows. Despite a number of arrests prior to 2016, largely driven by his intransigent drug addiction, Mr. Geiger was impressively able to change his life around in stark fashion, remaining crime free for eight years.



Notably, his 2016 offense, which he pled to pursuant to *Alford v. North Carolina*, resulted in only an agreed-upon sentence of 6 months, which suggests that the government and the Court were fully aware of the mitigating circumstances present. Moreover, Mr. Geiger has never once proceeded to trial. His history of taking responsibility for actions showcases his honest character and ability to acknowledge—and improve upon—his faults.

Mr. Geiger wishes to emphasize to the Court that the Mr. Geiger of the present is not like the Mr. Geiger reflected in left-hand-side of the above chart. In the past decade, Mr. Geiger has consistently shown that he has put that past behind him by working and staying sober. In 2019, he was self-employed and took on any home improvement job he could, which led to him being employed with the Carpenters Union Local 491, where he was trained and certified to take on more sophisticated home renovations. Mr. Geiger has been employed with the Union since 2021. Being a stable part of this Union is a huge accomplishment for Mr. Geiger. In fact, his employer at Coastal International has indicated that Mr. Geiger

has been employed with his company for three years and that he has ***"grown to be one of their most valuable employees in the DC region . . . and has grown to be one of their most valuable employees in the DC region."*** PSR at 82a. Mr. Geiger's employer also noted that he shows up early and always does a great job, and that he has build positive, prosocial relationships and networks through the job—a telltale sign of his job facilitating his overall prosocial life trajectory. *Id.*[2]

Mr. Geiger's dedication to his job, and the way his job has helped him shape his prosocial lifestyle, illustrated what sociologists and criminologists have found in empirical research: that quality employment can reduce and help eliminate criminal behavior among adults.[3] As one sociologist puts it: "Quality employment is often in short supply for those with extensive criminal histories, though it remains ***critical to establishing a prosocial identity in the process of desisting from crime***." Mr. Geiger is fortunate to have built a deep-rooted and mutually beneficial relationship with his employer. There is no doubt that with the continued stability supplied by his job, Mr. Geiger will continue being a productive member of society and a great father to his children.

---

[2] Sarah Lageson & Christopher Uggen, *How Work Affects Crime—And Crime Affects Work—Over The Life Course*, in Chris L. Gibson and Marvin D. Krohn (eds.), *Handbook of Life-Course Criminology: Emerging Trends and Directions for Future Research* 202 (2013) ("Working increases informal social controls and expands professional social networks, tying individuals to others in networks of reciprocal obligation.").
[3] *Id.* at 204.

Finally, Mr. Geiger's family responsibilities serve as a profoundly prosocial influence on his life. Mr. Geiger resides with his uncle, who spoke to probation, and advised that his nephew is a "good young man" and that he has been doing well while on release. PSR at 64d. His uncle has advised the Mr. Geiger is the breadwinner for his household and takes responsibility for his family members. *Id.* at 64c. He feels the weight of that responsibility. Mr. Geiger and his uncle have noted that, given this responsibility, Mr. Geiger is worried about going to jail and leaving his family unattended. *Id.*

In sum, this Court should feel assured that this is not a case in which the Court need to worry about Mr. Geiger's ability to desist from crime. The instant offense represents a clear outlier in Mr. Geiger's life trajectory and one for which he has shown deep and abiding remorse and acceptance of responsibility. Experts agree that "[a]dopting prosocial work and family roles, as well as developing an identity as a law-abiding citizen all facilitate desistance from crime."[4] Mr. Geiger has done just that. He is an example for other offenders in his ability to change his life around.

## B.    Nature and Circumstances of the Offense

On the evening of March 11, 2024, Mr. Geiger was installing a new radio in his vehicle while parked outside of his own home on the 1500 block of S Street Southeast at approximately 7pm. His vehicle was legally parked on the northside of

---

[4] *Id.*

the street in a residential area. Several police officers who were patrolling the block conducted a stop on Mr. Geiger's parked vehicle noting that he was "idling[5]." When officers approached Mr. Geiger's vehicle, they explained to him that they were checking on him because his windows were tinted and they could not see anything inside. Officers explained to Mr. Geiger that they observed him manipulate something on the right side of his jacket to which Mr. Geiger responds explaining that it was his phone and shows police the text message he received that he was viewing when police approached him. Officers then asked Mr. Geiger to step out of the vehicle and conducted a pat down, revealing a firearm on his person. Mr. Geiger was not brandishing the firearm and was just installing a car radio when law enforcement made contact with him. He did not resist arrest and was cooperative with police. In addition, he was not aware the firearm was stolen. [6]

Rather than litigate the lawfulness of the stop, Mr. Geiger chose to accept responsibility for this offense. He should be credited for the remorse and acceptance he has shown not only by his early acceptance and waiver of rights, but also because

---

[5] There is no such traffic violation in the District of Columbia for private vehicles. *See* DCMR Title 18, Section 2418.3.

[6] Mr. Geiger's offense level reflects a two-point adjustment based on the stolen nature of the firearm, but Mr. Geiger's lack of *mens rea* as to the firearm being stolen suggests that the offense level overstates his culpability. The United States Sentencing Commission is in fact set to vote on a proposed amendment to § 2K2.1 that would establish a *mens rea* requirement for the enhancements for stolen firearms. *See* USSC 2025 Proposed Amendments available at https://www.ussc.gov/guidelines/amendments/proposed-2025-amendments-federal-sentencing-guidelines-published-december-2024.

he has shown in the past two years that he is amenable to supervision by his overall compliance with conditions of release and his steady employment.

### IV.     The Purposes of Sentencing will be Accomplished with a Below Guideline Sentence.

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). Given Mr. Geiger's behavior in the past two years pending sentencing, a sentence of incarceration is not necessary for individual deterrence, to protect the public or for rehabilitation. Notably, a period of significant incarceration would derail the progress and upward trajectory of Mr. Geiger's rehabilitation.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ.

13

School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences." Austin, Brennan Ctr., *supra*, at 35. Some studies have concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher recidivism. *Id*. Similarly, a 2002 Justice Department study "found that recidivism rates did not differ significantly among those released after serving 6 months or less compared to those serving sentences all the way up to 30 months in prison." *Id*. at 36.

With respect to general deterrence, studies also "indicate that long prison sentences have little or no impact on reducing the criminal behavior of the public at large" because "most people consider immediate circumstances and emotions instead of longer term legal consequences when acting or reacting." *Id*. Significantly, a 1997 study in Richmond, Virginia "found no deterrent effect associated" with a policy "that increased prison sentences for gun crimes by prosecuting them as federal crimes." *Id*. at 37. It is often presumed that

14

incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[7] In short, there is little empirical support for the prospect that a lengthy period of confinement will be any more effective at deterring Mr. Geiger or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended

---

[7] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Community-based sanctions provide better opportunities for rehabilitation, and the Court can further serve the purposes of sentencing by imposing restrictive conditions of supervised release. *See Gall*, 552 U.S. at 48 (supervised release is a "substantial restriction of freedom").

Aside from the punishment Mr. Geiger has already endured by being arrested and charged first in superior court and then in federal court, the collateral consequences that attend to any felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another case, the Honorable Amit P. Mehta observed:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[8]

---

[8]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

Indeed, Mr. Geiger himself realizes the collateral consequences of his conduct—the potential for his conviction to impact his job and his ability to care for his family. *See* PSR at 64c. The need for specific deterrence in this case is therefore minimal. Mr. Geiger has already demonstrated his ability to adapt his behavior to societal norms, appreciates the consequences of his actions, accepts responsibility and has shown remorse, and has demonstrated consistent rehabilitation while in the community these past two years.

## V.    The Need to Avoid Unwarranted Sentencing Disparities

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).  A below guidelines sentence would not create unwarranted disparities. Indeed, the Sentencing Commission's Interactive Data Analyzer reveals that, among individuals sentenced under the same guideline and same criminal history category from 2020 to 2024, *49% received a sentence below two years*. Some comparable cases are noted below:

- *United States v. Olds-Shell*, 25-cr-152 (RDM): Mr. Olds-Shell was sentenced to time-served of 8 days' incarceration after pleading guilty to Unlawful

Possession of a Firearm. While there were many compelling reasons that this sentence was imposed, including his family situation, the Court also noted Mr. Olds-Shell's progress on pretrial release and not wanting to compromise the upward trajectory of his success by incarceration. Mr. Olds-Shell also had an old criminal history and had been stable for quite some time before his arrest for a possessory gun offense.

- *United States v. Collins,* 20-cr-033 (TNM): Mr. Collins accepted responsibility early just as Mr. Geiger did for unlawfully possessing a gun. His guideline range was 30-37 months. Although Mr. Collins was on supervision at the time for a prior carjacking offense, the Court varied downwards to 23 months' incarceration noting his remorse and acceptance of responsibility. The Court also noted the impact of COVID-19. Mr. Geiger did not commit this offense while on supervision and also demonstrated early remorse and acceptance of responsibility.

- *United States v. Van Dyke, Jr.*, 19-cr-344 (JEB): The honorable Judge Boasberg varied downward and sentenced the defendant to time-served in a 922(g) case where the guideline range was 37 to 46 months, and the Criminal Category was IV. In that case, the defendant had a prior conviction for carjacking and had made extraordinary efforts at rehabilitation while on pretrial release.

- *United States v. Denzel Boyd*, 1:19-CR-333 (ABJ): Unlike Mr. Geiger's 922(g) case, Mr. Boyd ran from officers and resisted arrest, even after being

detained, had several more recent prior felony convictions than Mr. Geiger, including a robbery and multiple gun convictions in addition to multiple prior distribution convictions. The Honorable Judge Berman-Jackson sentenced Mr. Boyd to time served after he had performed well on release prior to sentencing and demonstrated rehabilitation, just as Mr. Geiger has done.

The above cases demonstrate that variances are appropriate in cases where a defendant demonstrates early acceptance and progress on pretrial release, and particularly where the defendant shows a prosocial life trajectory, as Mr. Geiger does here. Indeed, the circumstances of Mr. Geiger's offense and his characteristics and history suggest that a sentence in the guidelines range would actually *create* unwarranted sentencing disparities among similarly situated defendants.

## VI. Conclusion

Given Mr. Geiger's demonstrated commitment to a prosocial lifestyle, his dedication to his job and his family, and his early acceptance, a variance in this case is warranted. A sentence of time-served would reflect Mr. Geiger's unique circumstances, support his continued growth, reinforce his prosocial characteristics, and avoid disruption to his positive trajectory, while affording just punishment and avoiding sentencing disparities.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob

19

Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org